**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3280-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

FRANK J. BAKER,

     Defendant-Appellant.

_____

Argued October 7, 2025 – Decided February 9, 2026

Before Judges Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 19-11-1082.

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant Frank J. Baker was convicted of murder and related offenses stemming from the fatal shooting of Jair Rennie outside Rennie's home on July 20, 2019. Rennie was romantically involved with defendant's ex-girlfriend, Anthonay McIver. McIver and defendant had been in an on-again/off-again romantic relationship since 2016 and had a child together. Upon driving to Rennie's home to confront McIver about her ongoing relationship with Rennie, defendant gave McIver an ultimatum, asking whether she wanted to be in a relationship with him or Rennie. When McIver chose Rennie, defendant shot Rennie four times. Defendant was sentenced to an aggregate term of forty-years in prison, with a thirty-three-and-one–half-year period of parole ineligibility, encompassing three consecutive prison terms.

On appeal, defendant raises the following Points for our consideration:

POINT I

THE JURY INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER FAILED TO ADDRESS THE EFFECT THAT A COURSE OF INFIDELITY, EMOTIONAL MANIPULATION AND DECEIPT CAN HAVE ON THE ISSUE OF PROVOCATION AND CREATED THE ERRONEOUS IMPRESSION THAT INFORMATIONAL WORDS CANNOT CONSTITUTE ADEQUATE PROVOCATION. THE DEFICIENT CHARGE, WHICH CUT TO THE

2

HEART OF THE DEFENSE CASE, REQUIRES REVERSAL OF DEFENDANT'S MURDER CONVICTION. (NOT RAISED BELOW).

POINT II

THE COURT ERRED IN PERMITTING THE INTRODUCTION OF MCIVER'S DUBIOUS CLAIM THAT [DEFENDANT] WAS "ALWAYS" THREATENING TO KILL HER AND ANY MAN SHE WAS WITH, WITHOUT FIRST CONDUCTING A[N N.J.R.E.] 404(B) ANALYSIS AND WITH NO INSTRUCTION TO THE JURY ON HOW TO EVALUATE SUCH EVIDENCE. (NOT RAISED BELOW).

POINT III

THE TRIAL COURT ERRED IN FINDING AGGRAVATING FACTOR (2) BASED ON THE "PERMANENT AND IRREVOCABLE" NATURE OF THE HARM CAUSED TO THE HOMICIDE VICTIM AND BY IMPOSING THREE CONSECUTIVE SENTENCES WITHOUT A PROPER YARBOUGH[1] ANALYSIS.

Having considered these arguments in light of the record and applicable legal principles, we affirm.

I.

We glean these facts from the twelve-day trial conducted between January 6 and February 1, 2023, during which the State produced ten law enforcement

---

[1] State v. Yarbough, 100 N.J. 627, 643-44 (1985).

and eight civilian witnesses, including McIver. Defendant testified on his own behalf and admitted to fatally shooting Rennie but maintained he acted in the heat of passion. Thus, the central issue at trial was whether defendant was guilty of murder or passion provocation manslaughter.

It is undisputed that defendant and McIver had been in a three-year, on-again/off-again romantic relationship since January 2016. Defendant was older and met McIver while she was still in high school. On the other hand, McIver and Rennie met in high school which they attended together. McIver testified she had been involved with both Rennie and defendant during part of 2016 but ended contact with Rennie when she got pregnant with defendant's child. McIver gave birth to their daughter in November 2018.

After giving birth, McIver moved in with defendant at his grandmother's home in Seabrook. However, McIver testified she would "bounce[]" back and forth between defendant's house and her mother's home in Gouldtown. According to McIver, she and defendant broke up in June 2019 after having an intense argument. After breaking up with defendant and moving back to her mother's house, McIver began a romantic relationship with Rennie.

Initially, Rennie was living in Gouldtown just a street over from McIver's mother's house. Rennie eventually moved to another residence where McIver

would visit him. The two would often sit in Rennie's car behind the residence drinking. Even before defendant and McIver broke up in mid-June 2019, defendant learned McIver and Rennie reconnected when Rennie called the cellphone defendant had bought for McIver. The phone call led to a heated argument between defendant and McIver, during which defendant broke the phone. Thereafter, McIver continued to communicate with Rennie secretly.

On June 26, 2019, after discovering McIver was spending time with Rennie so soon after they had broken up, defendant confronted Rennie at McIver's home and the two exchanged words. Defendant said to Rennie, "didn't I tell you to stay away from her." Rennie responded McIver had told him she was single. Defendant explained to Rennie "she [says that] all the time and then come[s] back to me." The encounter ended when Rennie told defendant he refused to "fight[] over a female" and proceeded to call the police. Thereafter, defendant confronted Rennie again on two separate occasions outside Rennie's residence to inform Rennie that defendant and McIver were still together and to tell Rennie to stay away from her. During both encounters, McIver was inside Rennie's house.

Between June 27 and July 6, 2019, defendant made a series of social media posts alluding to his rocky relationship with McIver, including one on June 27,

2019, stating, "When you love someone you just don't . . . treat them bad." On July 3, 2019, defendant and Rennie exchanged text messages in which defendant told Rennie he did not want anyone hurting McIver because she had "been through" a lot.

A couple days later on July 5, 2019, defendant messaged McIver wishing her and Rennie "the best," and telling McIver, "[y]ou deserve better than me." The following day, defendant referred to McIver as "disrespectful" for allowing Rennie to spend the night at her house with their daughter present against defendant's express wishes. Defendant had previously told McIver he did not want her to bring their daughter around Rennie.

In subsequent texts between defendant and McIver, defendant stated he had "mixed emotions," telling McIver she "could go live [her] life." Significantly, defendant texted McIver, "once you did something for him that you wouldn't do for me, you picked him." Defendant also texted McIver that he was "trying to let [her] be happy" and that Rennie "might be the one for [her]."

In a July 12, 2019 social media exchange between defendant and Rennie, defendant told Rennie to "[c]ome to . . . [the] crib, [McIver] trying to play a game with us, so let's make her pick who she want [sic]." Rennie responded McIver had already told him she was "trying to work it out with [defendant]"

and, as a result, Rennie was "going to leave her alone." Defendant insisted they should still meet so they could "get in front of her so there's no confusion." Rennie responded, "All right . . . . [W]henever I get out that way."

Thereafter, defendant and McIver seemingly reconciled, going on various dates including to an escape room on July 14, 2019, and an arcade on July 17, 2019, three nights before the shooting. After each date, defendant, McIver and their daughter slept at defendant's home.

On the morning of July 19, 2019, Rennie stopped by McIver's home to see her. She told him she would come over to his house later that night. When defendant went to McIver's house the afternoon of July 19 and saw McIver texting Rennie, they argued about it until defendant left. As promised, McIver went to Rennie's house that night and they spent time together.

The following day, July 20, 2019, McIver drove her mother to and from work in her mother's Hyundai Sonata. Defendant spent much of the day trying to locate McIver so that he could see his daughter. After leaving the baby with her mother, McIver went to see Rennie, parking her mother's car in the yard behind Rennie's house for privacy. McIver and Rennie spent time together in and out of the Sonata until McIver observed defendant's van drive by Rennie's house. After Rennie left McIver in the Sonata and entered the house to look out

A-3280-22

the front window to see if defendant was still around, defendant approached the Sonata.

When defendant started banging on the driver's side window, McIver started the car and tried to back out of the yard, but defendant positioned himself behind the car to prevent her from leaving. Rennie came out of the house and he and defendant exchanged words. Defendant told Rennie he had been with McIver two nights prior. At that point, defendant gave McIver an ultimatum and asked McIver whom she wanted to be with. McIver responded "Jair," choosing Rennie over defendant. When defendant said "huh," McIver repeated her choice by saying Rennie's name again. According to defendant, when McIver said Rennie's name the second time, it was more "aggressive[]" and he "blacked out." He shot Rennie four times and then fled the scene.[2]

After hearing gunshots, a next-door neighbor looked out her back door and saw McIver kneeling over Rennie's body before driving away. Rennie was transported to a hospital after the neighbor got help but succumbed to his injuries, which included four gunshot wounds to his cheek, the back of his head, his shoulder, and his lower back.

---

[2] Defendant testified he "kept a gun" in his pocket because he had previously been robbed. He admitted he did not have a permit to carry the gun. Defendant testified that after the shooting, he discarded the gun in a dumpster.

A-3280-22

Before driving away, McIver banged on the back door of the house where Rennie resided but no one answered. McIver later revealed to detectives that she drove to a nearby carwash because she saw blood splatter on the door of her mother's car. While at the carwash, she noticed a bullet hole in the driver's sideview mirror.

After the shooting, defendant picked up his friend Marquiss Wilson and drove to his father Frank Baker, III's home in Cedarville. According to Baker III, he heard his son had shot someone but did not believe it. Baker III allowed defendant to park his van in his garage and went to the store to buy bleach at defendant's request.

McIver also drove to Baker III's home with her daughter. Wilson helped McIver wash the Sonata after spotting blood on the door. Wilson also disposed of both defendant's and McIver's cellphones by smashing them with a sledgehammer and throwing them into the woods behind Baker III's house.

When Baker III returned with the bleach, both McIver and defendant showered, removing their clothing and pouring bleach all over their bodies. Baker III later told police he burned defendant's clothing in a fire pit in his yard and disposed of the Sonata's sideview mirror with the bullet hole by tossing it

9

into the woods. Although the gun was never recovered, police found fragments of smashed cell phones, the sideview mirror, and burnt clothing.

Baker III asked defendant's aunt, Teresa Baker, to take defendant to an address in Delaware and she agreed. Teresa,[3] along with defendant's brother Nisear, picked defendant up from Baker III's home. While the three were driving to Delaware, defendant's parents called defendant and convinced him to turn himself in, after which Teresa drove defendant to the police barracks in Bridgeton where defendant surrendered.

On November 6, 2019, a Cumberland County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count three); first-degree witness tampering, N.J.S.A. 2C:28-5(a)(5) (count four); second-degree conspiracy to commit witness tampering, hindering apprehension or prosecution, obstruction, or tampering with physical evidence, N.J.S.A. 2C:5-2(a)(1) (count five); third-degree hindering apprehension of prosecution, N.J.S.A. 2C:29-3(b)(1) (count

---

[3] Because multiple parties share a surname, we refer to Teresa Baker by her first name. No disrespect is intended.

six); fourth-degree obstructing the administration of law, N.J.S.A. 2C:29-1(b) (count eight); and fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1) (count nine).[4]  On February 1, 2023, the jury returned a verdict of guilty on all charges except count four, which was dismissed prior to the verdict on the State's motion.  After the judge denied defendant's motion for a new trial, see Rule 3:20-1, defendant was sentenced and a conforming judgment of conviction was entered on May 3, 2023.  This appeal followed.

## II.

In Point I, defendant argues the jury instruction for passion/provocation manslaughter was erroneous.  Specifically, he argues the charge "created the misleading impression that passion/provocation requires some threat of physical violence, and that words alone can never mitigate murder to manslaughter."  On the contrary, he argues "[a] continuing course of ill treatment against . . . defendant or words that convey information that would arouse the passions of a reasonable person can constitute adequate provocation."  He asserts the judge failed to instruct the jury "on those topics" so the jurors could determine "what form of homicide . . . defendant committed."

---

[4]  Baker III, Wilson, and Nisear were also charged in various counts of the same indictment.  Baker III and Nisear testified at defendant's trial.

Our jurisprudence governing appropriate jury charges is well settled.

> "Appropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). The court must "explain the controlling legal principles and the questions the jury is to decide." State v. Martin, 119 N.J. 2, 15 (1990). Instructions demand careful attention and "must provide a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." State v. Montalvo, 229 N.J. 300, 320 (2017) (citations and internal quotation marks omitted). Proper instruction is so critical that "erroneous instructions on material points are presumed to be reversible error." Martin, 119 N.J. at 15.
>
> [State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (citations reformatted).]

Because defendant failed to object to the passion/provocation charge during trial and raises the issue for the first time on appeal, we review for plain error. See R. 2:10-2; State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if [the defendant] does not object to the instructions as required by Rule 1:7-2."). Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a

12

clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting Adams, 194 N.J. at 207).

"Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Still, if a defendant does not object when a charge is given, as here, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." Montalvo, 229 N.J. at 320 (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

Defendant was charged with first-degree murder pursuant to N.J.S.A. 2C:11-3(a)(1). Passion/provocation manslaughter is a lesser included offense of murder, including "all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability." State v. Robinson, 136 N.J. 476, 482 (1994). A criminal homicide is considered passion/provocation manslaughter only when "[a] homicide which would otherwise be murder under [N.J.S.A. 2C:11-3] is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). A jury may convict a defendant of murder only "if the

State proves beyond a reasonable doubt that the purposeful killing was not the product of passion/provocation."  State v. Wilson, 128 N.J. 233, 238 (1992).

Passion/provocation manslaughter is comprised of four elements.  State v. Mauricio, 117 N.J. 402, 411 (1990).  "[T]he provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying."  Ibid.  The first two elements are objective, while the last two are subjective.  State v. Carrero, 229 N.J. 118, 129 (2017).  "If a slaying does not include all of those elements, the offense of passion/provocation manslaughter cannot be demonstrated."  Mauricio, 117 N.J. at 411.

"As to the first element, 'the provocation must be "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control."'"  Carrero, 229 N.J. at 129 (alterations in original) (quoting Mauricio, 117 N.J. at 412).  "The provocation must be severe enough that the 'intentional homicide may be as much attributable to the extraordinary nature of the situation as to the moral depravity of the actor.'"  Mauricio, 117 N.J. at 412.

"The generally-accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to

manslaughter." State v. Crisantos, 102 N.J. 265, 274 (1986); see also Mauricio, 117 N.J. at 413 ("[W]ords alone do not constitute adequate provocation."); Carrero, 229 N.J. at 129 ("Words alone are insufficient to create adequate provocation . . . but the presence of a gun or knife can satisfy the provocation requirement."). However, "a course of ill treatment which can induce a homicidal response in a person of ordinary firmness and which the accused reasonably believes is likely to continue, should permit a finding of provocation." State v. Guido, 40 N.J. 191, 211 (1963).

At trial, defendant did not object to the passion/provocation charge and did not request any further instruction on the "course of ill treatment" that he now claims was necessary. In pertinent part, the judge instructed the jury on passion/provocation manslaughter as follows:

> The first factor you must consider is whether the State has proven beyond a reasonable doubt that the provocation was not adequate. Whether the provocation is inadequate essentially admits to whether loss of self[-]control is a reasonable reaction to the circumstance.
>
> In order for the State to carry its burden it must prove beyond a reasonable doubt that the provocation was not sufficient to arouse passions of an ordinary person beyond the power of his control.
>
> For example, words alone do not constitute adequate provocation. On the other hand, a threat with

15

a gun or knife or a significant physical confrontation might be considered adequate provocation. Again, the State must prove that the provocation was not adequate.

The charge substantially tracked the model jury charge for passion/provocation manslaughter. See Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3(a)(1) and (2); 2C:11-4(a), (b)(1) and (b)(2))" (rev. June 8, 2015). Although model jury charges "are not binding authority," State v. Bryant, 419 N.J. Super. 15, 28 (App. Div. 2011), "a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough,'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)); see also R.B., 183 N.J. at 325 (instructing trial courts to follow the model jury charges and read them "in their entirety to the jury"); State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) ("When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000))).

Defendant now contends "a continuing course of ill treatment" against him that would "arouse the passions of a reasonable person" can constitute adequate

16

provocation and the judge omitting such an instruction rises to the level of plain error. Defendant analogizes his case to Guido, 40 N.J. 191, and State v. Erazo, 126 N.J. 112 (1991), where the passion/provocation charge was warranted based on a course of ill treatment.

In Guido, 40 N.J. at 195-96, the defendant shot and killed her husband who had been abusive towards her. Our Supreme Court recognized that while defendant did not identify any single earlier confrontation as "the provocative one," the history of prolonged physical and emotional abuse, combined with the defendant's belief that it would continue, could legally suffice as provocation. Id. at 210-11. The Court concluded it was a question of fact

> whether the accused did, because of such prolonged oppression and the prospect of its continuance, experience a sudden episode of emotional distress which overwhelmed her reason, and whether, if she did, she killed because of it and before there had passed time reasonably sufficient for her emotions to yield to reason.
>
> [Id. at 211.]

In Erazo, 126 N.J. at 117-20, the defendant fatally stabbed his wife after she threatened to report him for a parole violation. The trial court incorrectly gave an instruction to the jury that implied the defendant had the burden to prove passion/provocation in support of a manslaughter charge. Id. at 125-26. In

reversing the capital murder conviction, the Court held there was sufficient evidence of provocation to support a passion/provocation manslaughter charge, but "the charge erroneously placed on [the] defendant the burden of proving passion/provocation." Id. at 122. The evidence the Court considered as supporting the charge included the threat of the parole violation, defendant's emotional distress after the threat, a history of abuse in "a marriage fraught with violence," and recriminations by both the defendant and his wife. Id. at 124-25.

The model jury charge directs that, where appropriate, the jury should be instructed that "a continuing course of ill treatment by the decedent against the defendant or a third person 'with whom the defendant stands in close relationship,' can constitute adequate provocation." Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3(a)(1) and (2); 2C:11-4(a), (b)(1) and (b)(2))," at 5 n.16 (rev. June 8, 2015). But the cases cited in the charge as examples all deal with continuing courses of physical abuse, not infidelity. See State v. Coyle, 119 N.J. 194, 225-28 (1990); State v. Kelly, 97 N.J. 178, 218-19 (1984); Guido, 40 N.J. at 196.

In State v. Hollander, 201 N.J. Super. 453, 474 (App. Div. 1985), we held "evidence that [the] defendant was sexually rejected, teased or repulsed by a

paramour is insufficient to constitute adequate provocation." State v. McClain, 248 N.J. Super. 409, 419 (App. Div. 1991) (citing Hollander, 201 N.J. Super. at 474). In McClain, 248 N.J. Super. at 413, the defendant was convicted of murder after fatally shooting the victim with whom she had "had a long-term intimate relationship." Although the victim had "affairs with other women" and "fathered a child with another woman," historically, the "defendant would eventually resume the relationship on [the victim's] representation that the other women did not matter to him." Ibid.

The ultimate claim of provocation in McClain was based in part on the victim telling the defendant immediately before the shooting, "he was his own man and would do whatever he wanted to do[,] and he never intended to marry her or anyone." Id. at 414. After the shooting, the "defendant was heard to say she shot [the victim] because she was 'tired of him cheating on [her]' or 'because [she] was tired of him f---ing over [her].'" Ibid.[5] We concluded "[t]his is simply not the type of evidence that has ever been recognized as being sufficiently provocative 'to arouse the passions of any ordinary [person] beyond the power

_____

[5] Although there was evidence the victim had physically assaulted the defendant on two occasions and had verbally threatened to harm her if she terminated the relationship, these incidents occurred years prior to the victim's death. Id. at 413.

of his [or her] control.'" Id. at 420 (second and third alterations in original) (quoting State v. King, 37 N.J. 285, 301-02 (1962)).

Like McClain, here, the victim did not subject defendant to a course of ill treatment which could induce a homicidal response in a person of ordinary firmness and which defendant could have reasonably believed was likely to continue. Defendant did not allege any physical abuse or threats of violence that preceded his decision to shoot and kill Rennie. In fact, in the last social media conversation between the two, Rennie expressed his belief that McIver had chosen defendant over him and claimed he did not want to get between them. Defendant wanted to arrange a meeting among himself, Rennie, and McIver because he already knew McIver was seeing Rennie and he wanted to force McIver to make a choice.

Defendant's only claim of mistreatment was the emotional distress he felt from McIver's infidelity and McIver allegedly denying him access to their child. However, that distress was not a result of an ongoing campaign of abuse or ill treatment. By his own admission, defendant was already aware of McIver's infidelity, thus undermining his contention that her choosing Rennie over him constituted a final triggering revelation that amounted to adequate provocation. According to defendant, McIver's words caused him to feel "shock, anger, and

emotional pain." However, such feelings are more indicative of jealousy, which is not considered a form of reasonable provocation. See McClain, 248 N.J. Super. at 419 ("[E]vidence that [the] defendant was sexually rejected, teased[,] or repulsed by a paramour is insufficient to constitute adequate provocation.").

A jury instruction regarding a continuing course of ill treatment is only appropriate where the defendant is subjected to a sustained pattern of mistreatment that would provoke a reasonable person and where there is evidence that the defendant reasonably believed mistreatment would continue. Guido, 40 N.J. at 211. No such evidence was presented here. At most, defendant's testimony shows he was emotionally distressed and jealous due to McIver's relationship with Rennie. However, his knowledge of McIver's and Rennie's relationship, his prior communications with Rennie, and his intention to arrange a meeting among the three shows that his actions were not spontaneous or the result of cumulative mistreatment. Thus, there is no more evidence here to support a continuing course of ill treatment than there was in McClain.

Defendant further argues the passion/provocation charge failed to address "McIver's history of infidelity, deceit and emotional manipulation" and gave jurors "the false impression" that unless accompanied by "a weapon or

significant physical confrontation," words alone could not constitute adequate provocation. Defendant contends because the adequacy of the provocation is at issue, the jury should have been instructed that "informational words, if they would trigger a sudden episode of emotional distress, can constitute adequate provocation."

In support, defendant relies on 2 Wharton's Criminal Law § 22:6 (16th ed. 2021), which distinguishes "informational" from "insulting" words, stating while insulting words "do not constitute adequate provocation" on their own, informational words, on the other hand, could do so under certain circumstances. For example, "[a] sudden disclosure of an event" that is legally adequate to constitute provocation, such as that the deceased "had raped a family member or committed adultery with the [defendant's] wife," could "be the equivalent of the event presently occurring" and, to that extent, could itself constitute adequate provocation. Ibid. Thus, information conveyed orally may be sufficient provocation.

No New Jersey case has applied the "informational words" exception to the circumstances presented here. Even if there was precedent,[6] defendant was

_____

[6] We acknowledge that some jurisdictions do recognize that information conveyed orally may be sufficient provocation to support a verdict of

aware that McIver had not been faithful to him and had argued with McIver on several occasions prior to the murder about her infidelity and her contact with Rennie. On one occasion, defendant even confronted Rennie directly and, on another, defendant expressed to Rennie his intention to arrange a meeting with all three to confront McIver and force her to make a choice. Critically, in a prior text exchange with McIver, defendant confirmed that McIver had already chosen Rennie over him by her actions. Thus, McIver choosing Rennie in the moments before defendant shot and killed Rennie would not be considered a "sudden disclosure" that amounted to adequate provocation.[7]

## III.

In Point II, defendant argues the judge erred in admitting McIver's testimony about prior threats made by defendant without conducting a N.J.R.E.

---

manslaughter. See, e.g., People v. Poole, 159 Mich. 350, 353 (1909) (the defendant learned of his wife's adultery); Haley v. State, 123 Miss. 87, 99, 103-04 (1920) (same); State v. Grugin, 147 Mo. 39, 48-62 (1898) (admission to rape of the defendant's daughter); Commonwealth v. Berry, 461 Pa. 233, 238 (1975) (the defendant learned his mother was struck by the decedent); State v. Martin, 216 S.C. 129, 140 (1949) (the defendant learned of his wife's rape), overruled on other grounds by State v. Belcher, 385 S.C. 597 (2009); State v. Flory, 40 Wyo. 184, 204-05 (1929) (same).

[7] For the same reason, we also reject defendant's contention that during summation, the prosecutor exacerbated the error by providing "misleading hypotheticals and the incomplete statement in the model jury instruction that words alone are insufficient."

404(b) hearing. He asserts even if the evidence was admissible, the judge erred by failing to give the jury guidance on how to evaluate the evidence.

Because defendant raises the issue for the first time on appeal, we again review for plain error to determine if the alleged error is "clearly capable of producing an unjust result." Montalvo, 229 N.J. at 320-21 (quoting R. 2:10-2); see also State v. Reeds, 197 N.J. 280, 298 (2009) ("[W]hen counsel fails to object to offensive testimony, we . . . apply the plain error standard of review . . . .").

"The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). Instead, plain error "is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (citation omitted) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019); and then quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Indeed, our Supreme Court has "cautioned that 'rerun[ning] a trial when the error could easily have been cured on request[ ] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Singh, 245 N.J. 1, 13 (2021) (alterations in original) (quoting Santamaria, 236

24

N.J. at 404-05). Thus, "[t]o determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" Id. at 13-14 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). Further, the burden is on the defendant to show plain error. State v. Weston, 222 N.J. 277, 295 (2015).

On the night of the shooting, McIver gave a recorded statement to police in which she made no mention of any threats defendant had made against her or anyone else. When police brought her back the following day to give a second statement to address inconsistencies in her first statement, McIver gave a handwritten statement in which she claimed that when she and defendant argued, defendant was "always" making threats about killing her and any man she was in a relationship with, and that defendant had told her, "You'll never be able to leave me. We're in this together." The handwritten statement was read into the record after McIver professed a lack of memory of the events surrounding the shooting.

We agree with defendant that McIver's handwritten statement about his alleged threats to kill described prior bad acts that should not have been admitted without performing a N.J.R.E. 404(b) analysis as spelled out in State v. Cofield, 127 N.J. 328 (1992). See State v. Vargas, 463 N.J. Super. 598, 612-16 (App.

Div. 2020) (holding defendant's verbal threat to the victim a few months before the homicide that "if you can't be with me, then you can't be with anyone" satisfied N.J.R.E. 404(b)).  In cases such as this where the trial court did not analyze the admissibility of N.J.R.E. 404(b) evidence under Cofield, "we conduct a plenary review" to assess whether admission of the evidence was nonetheless appropriate.  State v. Lykes, 192 N.J. 519, 534 (2007) (citing State v. Reddish, 181 N.J. 553, 609 (2004)).

N.J.R.E. 404(b)

> provides that ["e]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith."  That Rule, however, goes on to explain that "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."  Thus, unless relevant under one of the exceptions of Rule 404(b), the prior bad acts or other-crimes evidence is simply inadmissible.
>
> [Lykes, 192 N.J. at 534 (second alteration in original).]

In State v. Williams, 190 N.J. 114 (2007), our Supreme Court reaffirmed the Cofield paradigm by which prior bad acts or other-crimes evidence is to be analyzed.  The Court explained:

> In [Cofield, 127 N.J. at 338], this Court framed a four-pronged test to determine whether to admit other-

crimes evidence for a permitted purpose under N.J.R.E. 404(b). The Cofield test requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Williams, 190 N.J. at 122 (citations omitted).]

"Williams, however, makes clear that '[t]he requirement set forth as prong two of Cofield . . . is not one that can be found in the language of Evidence Rule 404(b)[, and] Cofield's second prong, therefore, need not receive universal application in Rule 404(b) disputes." Lykes, 192 N.J. at 535 (alterations in original) (quoting Williams, 190 N.J. at 131).

Defendant acknowledges "the alleged threats are arguably relevant to motive," and only challenges the third prong, asserting if the judge had held a N.J.R.E. 404(b) hearing, "the State would not have met its burden to establish by clear and convincing evidence that [defendant] actually made these threats." In support, defendant contends "McIver was an admitted liar and cheat" and

27

McIver admitted during her trial testimony that she had "different stories" and the accuracy of her statement "was questionable."  According to defendant, "McIver had a motive to make herself appear as a victim who had reason to fear [defendant]" to "engender sympathy" and "deflect attention from her own bad conduct," which included leaving the scene to drive to a car wash to remove the blood splatter from her mother's car instead of seeking medical help for Rennie as she had originally claimed.

We agree with defendant the statement does not satisfy the third <u>Cofield</u> prong because the State cannot establish by clear and convincing evidence defendant actually made the threats.  See <u>State v. Hernandez</u>, 170 N.J. 106, 123-24 (2001) ("[T]he third prong of <u>Cofield</u> requires the trial court to ensure that the jury hears only clear and convincing proof that the other crime or bad act occurred and that the defendant was responsible for the conduct.").

McIver's uncorroborated statement was discredited out of her own mouth. She admitted she had "different stories," questioned the accuracy of her own statement, and claimed she had no memory of the events surrounding the shooting.  Although "[t]he clear and convincing standard may be satisfied by uncorroborated testimonial evidence,"

> [c]lear and convincing "evidence is that which 'produce[s] in the mind of the trier of fact a firm belief

28

> or conviction as to the truth of the allegations sought to be established,' evidence 'so clear, direct and weighty and convincing as to enable (the factfinder) to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'"
>
> [Hernandez, 170 N.J. at 127 (second alteration in original) (quoting In re Samay, 166 N.J. 25, 30 (2001)).]

McIver's statement does not meet the clear and convincing standard.[8]

Nevertheless, our inquiry does not end here because we must determine whether the admission of the evidence rises to the level of plain error "in light of the overall strength of the State's case." Singh, 245 N.J. at 13-14 (quoting Sanchez-Medina, 231 N.J. at 468). We conclude it does not.

There was no risk the jury convicted defendant based on the admission of prior bad acts evidence because the other evidence of guilt was overwhelming. Defendant's own testimony was damning. He admitted being aware of the relationship between McIver and Rennie for weeks before the shooting, acknowledged in a text that McIver had already selected Rennie over him by virtue of her conduct, and admitted being armed with a gun as he searched for McIver because he suspected she was with Rennie. In light of defendant's testimony alone, there was not a substantial likelihood that the jury convicted

---

[8] Based on our decision, we need not address the fourth Cofield prong.

him based on the single mention of defendant previously threatening to kill McIver and any man she was in a relationship with and there was not a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.

Additionally, there was evidence from multiple sources that defendant conspired with his family and friend to destroy evidence and flee the jurisdiction, all evidence of consciousness of guilt. See Williams, 190 N.J. at 129 (holding that evidence that the defendant attempted to destroy and otherwise tamper with evidence and lied to police to avoid apprehension was admissible as evidence of consciousness of guilt).

IV.

Lastly, in Point III, defendant argues the judge erred in his analysis of the aggravating factors and failed to conduct a proper Yarbough/Torres[9] analysis.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating

---

[9]  State v. Torres, 246 N.J. 246 (2021).

factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under New Jersey's penal code, "a sentencing court first must determine, pursuant to N.J.S.A. 2C:44-1(a) and (b), whether aggravating and mitigating factors apply. After balancing the factors, the trial court may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). We do not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 205 N.J. 109, 127 (2011) (quoting Bieniek, 200 N.J. at 608). Still, "[i]n their application of the N.J.S.A. 2C:44-1 factors, sentencing courts are cautioned to avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense." State v. Lawless, 214 N.J. 594, 608 (2013).

Ultimately,

[w]hether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors. Fuentes, 217 N.J. at 72. "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend

31

toward the higher end of the range." State v. Natale, 184 N.J. 458, 488 (2005).

[Case, 220 N.J. at 64-65 (second alteration in original) (citations reformatted).]

In State v. Yarbough, 100 N.J. 627, 643-44 (1985), our Supreme Court set forth guidelines for evaluating the threshold question of whether to impose concurrent or consecutive sentences pursuant to N.J.S.A. 2C:44-5(a). The Yarbough Court enumerated five specific facts sentencing courts should consider, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [Yarbough, 100 N.J. at 644.]

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory

range," State v. Abdullah, 184 N.J. 497, 514 (2005), and "should be applied qualitatively, not quantitatively." State v. Carey, 168 N.J. 413, 427 (2001); see also State v. Molina, 168 N.J. 436, 442 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims"). Further, our Supreme Court has made clear that an "explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding" is essential to facilitate meaningful appellate review. Torres, 246 N.J. at 268.

Here, after appropriate mergers, the judge sentenced defendant to thirty years in prison, with a thirty-year parole disqualifier, for murder (count one); a consecutive five-year term, with a three-and-one-half year parole disqualifier pursuant to the Graves Act, see N.J.S.A. 2C:43-6(c), for unlawful possession of a handgun (count three); and a consecutive five-year term for hindering apprehension (count six). The judge found aggravating factors two, three, and nine based on "[t]he gravity of the harm to . . . Rennie," "the risk that . . . defendant will commit another offense," and the need for "general[]" and "specific" deterrence. See N.J.S.A. 2C:44-1(a)(2), (3), (9). To support aggravating factor three, the judge relied on defendant's trial testimony demonstrating he had purchased and been in possession of illegal handguns on

33

more than one occasion. The judge also considered defendant's testimony to support aggravating factor nine. The judge found mitigating factors seven and fourteen because defendant had no "prior record" and was "under [twenty-six] years of age at the time of this offense." See N.J.S.A. 2C:44-1(b)(7), (14). After balancing and weighing the factors, the judge found "the aggravating factors substantially outweigh[ed] the mitigating factors."

Further, the judge explained consecutive sentences were warranted because there were "[i]n many senses . . . three very distinct crime scenes," "[o]ne being Gouldtown, the other being the generalized nature of . . . defendant carrying around a pistol with him as was testified to, and then the events that took place in Cedarville." The judge determined the sentence was "genuinely fair . . . on an overall basis given the gravity of the offenses" and "the level of harm [caused] to the victim and to the victim's family."

Defendant argues by applying aggravating factor two, see N.J.S.A. 2C:44-1(a)(2) ("[t]he gravity and seriousness of harm inflicted on the victim"), the judge engaged in "improper double counting." We agree. In finding aggravating factor two, the judge placed significant weight on the "permanent and irrevocable" nature of the victim's death. See State v. Jarbath, 114 N.J. 394, 404

34

(1989) (explaining that the victim's death cannot be double-counted as an aggravating factor in a manslaughter case because it is an element of the crime).

However, the error had no impact on the murder sentence because the judge imposed the mandatory minimum sentence. See N.J.S.A. 2C:11-3(b). Further, the judge was permitted to consider that factor in connection with the other offenses. See State v. Boyer, 221 N.J. Super. 387, 405-06 (App. Div. 1987) (explaining that while relying on the victim's death in imposing sentence for a murder conviction "would have been clearly erroneous," the "victim's death was not an inappropriate factor to consider in sentencing defendant on the [other] count[s]").

Defendant also argues the judge placed "undue consideration on [his] history of carrying a gun for self-defense," using it as the impetus for finding a strong need for deterrence. On the contrary, the judge's finding was based on competent and credible evidence in the record. We also reject defendant's contention that the judge failed to conduct a proper Yarbough analysis and assess the fairness of the sentence as a whole pursuant to Torres. We are satisfied the judge gave a well-reasoned explanation for imposing consecutive sentences, which was supported by the record and comported with the dictates of Yarbough and Torres.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3280-22